# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE


IN RE: WESTECH CAPITAL CORP.     :     **Consol. C.A. No. 8845-VCN**


## MEMORANDUM OPINION


Date Submitted: January 24, 2014
Date Decided: May 29, 2014

Neil B. Glassman, Esquire, Stephen B. Brauerman, Esquire, Vanessa R. Tiradentes, Esquire, and Sara E. Bussiere, Esquire of Bayard, P.A., Wilmington, Delaware; Michael J.W. Rennock, Esquire of Steptoe & Johnson LLP, New York, New York; and Daniel H. Byrne, Esquire and Dale Roberts, Esquire of Fritz, Byrne, Head & Harrison, PLLC, Austin, Texas, Attorneys for Plaintiff John J. Gorman, IV.

Michael J. Maimone, Esquire, Gregory E. Stuhlman, Esquire, and E. Chaney Hall, Esquire of Greenberg Traurig, LLP, Wilmington, Delaware, Attorneys for Defendants Gary Salamone, Mike Dura, and Robert W. Halder.

NOBLE, Vice Chancellor

# I. INTRODUCTION

This post-trial Section 225 opinion resolves a dispute about the meaning of two subsections of a voting agreement which determine how its signatories designate directors. Either subsection at issue could be interpreted as a majority of shares or per capita voting provision. Perhaps unsurprisingly, the difference in interpretation could grant control of the board to either the plaintiff or the incumbent defendants.[1]

The Court denied the parties' cross motions for judgment on the pleadings because the two provisions were ambiguous.[2] The parties engaged in additional discovery to resolve the ambiguity and provided extrinsic evidence through a stipulated record. After considering the evidence and the arguments offered by the parties, the Court concludes that one ambiguous provision provides for majority of shares voting and the other, which uses the term "elect" without defining it, provides for per capita voting.

The Court was also asked to evaluate the validity of several different acts which sought to restructure the board's composition. After considering those acts,

---

[1] Both sides filed complaints on the same day and requested that the Court determine the proper composition of the board. Defendants filed their complaint under C.A. No. VCN-8844. The Court consolidated the two actions under plaintiff's action, C.A. No. VCN-8845, which caused the incumbent board members to appear as defendants.

[2] Pretrial Teleconference and Rulings of the Court on Cross Motions for Judgment on the Pleadings, C.A. No. 8845-VCN (Del. Ch. Dec. 12, 2013).

the Court finds that the company's current directors are Salamone, Gorman, Ford, and Dura (all defined below).

## II. BACKGROUND

Plaintiff John J. Gorman, IV ("Gorman") and six others founded Nominal Defendant Westech Capital Corp. ("Westech" or the "Company"), a Delaware corporation, in 1994.[3]  Westech, which went public in 2001, wholly owns Tejas Securities, Inc. ("Tejas"), its primary operating subsidiary and a broker dealer regulated under the Exchange Act of 1934 and by the Financial Industry Regulatory Authority ("FINRA").[4]

Before the execution of the disputed voting agreement, Gorman owned a majority of Westech's common stock and purportedly controlled the board, which consisted of Gorman; Charles Mayer, his uncle; and Robert W. Halder ("Halder").[5] Gorman's father-in-law purportedly also served on the board at an earlier time, but later resigned due to illness.  On September 23, 2011, the Company issued Series A Preferred stock to investors for $25,000 per share.[6]  Gorman's friend James J. Pallotta ("Pallotta") invested $2 million in the Company to acquire eighty shares of Series A Preferred (the "Pallotta Shares").[7]  Gorman invested $1.8 million in Series

---

[3] Pre-trial Stipulation ("Stip.") ¶ II.A.1.
[4] *Id.* ¶¶ II.A.4, .6-.7.
[5] Defs.' Pretrial Br. at 5.
[6] Stip. ¶ II.B.23.
[7] *Id.* ¶ II.A.20.

A Preferred and convertible notes.[8] The family members of former Westech CEO, and nonparty, James Fellus ("Fellus") purchased twenty-four shares of Series A Preferred.[9] Fellus also acquired forty shares in exchange for a promissory note upon which he did not make payments and on which he defaulted.[10] Halder, directly and indirectly, purchased nine shares of Series A Preferred and convertible notes.[11] A number of other investors purchased smaller holdings, although these investors are not generally discussed in the parties' arguments.[12] The parties dispute the impetus for this transaction, which is described in greater detail below.

When issuing the Series A Preferred, the Company and its preferred investors executed a voting agreement (the "Voting Agreement").[13] The Voting Agreement contained director designation provisions for a seven-member board which assured certain significant investors that they would have board representation. From the time when the Voting Agreement was executed until Gorman initiated his attempts to regain control of the Company, its board of directors had five of seven seats filled and was composed of directors Gorman, Mike Dura ("Dura"), A. Peter Monaco ("Monaco"), Gary Salamone ("Salamone"),

---

[8] JX 4, Schedule A & A-1 (listing sixty-eight shares owned across various Gorman affiliates and four shares of Series A convertible notes).

[9] Stip. ¶ II.B.18.

[10] *Id.* ¶ II.B.19. Fellus's default is the subject of a lawsuit filed by the Company against him in a federal district court in Texas.

[11] *Id.* ¶ II.B.16; JX 4, Schedule A & A-1.

[12] *See* JX 4, Schedule A & A-1 (the next largest investor appears to have purchased twenty shares and it is not mentioned by the parties in their briefing).

[13] JX 4 (the Voting Agreement).

and Halder.[14]  Gorman and Halder served pursuant to Section 1.2(c) of the Voting Agreement as "Key Holder Designees."  Monaco served pursuant to Section 1.2(a), as the "Pallotta Designee."  Salamone was and is the CEO, and is the holder of the only board seat which has not been contested at some point during this action; he holds that seat pursuant to Section 1.2(d), as the "CEO Director."  Dura served pursuant to Section 1.2(e), as one of the two industry directors (the "Industry Directors").  Dura, Halder, and Salamone (the "Incumbents") are the directors of the Company pursuant to this Court's status quo order.[15]

After the Series A Preferred round of financing, Westech had two classes of stock: 4,031,722 shares of common stock and 338 shares of Series A Preferred stock.  Westech's governing documents grant the Series A Preferred stock the right to vote together with the common on an as-converted basis, such that each share of Series A Preferred receives 25,000 votes.[16]  Westech's certificate of incorporation provides that each share of common stock is entitled to one vote per share.[17]

In late summer 2013, Gorman bought out Pallotta's interest.  Thus, as of the time of this action, Gorman owned approximately 2.4 million shares of common (approximately 59.5% of the common) and 173 shares of the Series A Preferred

---

[14] *See* Stip. ¶¶ II.C.28-.29.  No particularly helpful evidence was submitted concerning the parties' course of conduct in relation to the election process, presumably because the composition of the board did not change until the events leading to this action.

[15] Order Maintaining Status Quo, C.A. No. 8845-VCN (Del. Ch. Sept. 4, 2013).  The Incumbents and Westech are sometimes referred to collectively as the Defendants.

[16] Stip. ¶¶ II.A.8-.9; JX 20 § 5.1.

[17] JX 3, Ex. A §§ 4.1-4.2.

(approximately 51.2% of the preferred).[18] Halder's nine shares of Series A Preferred represent approximately 2.66% of the preferred.[19] Fellus's forty shares of Series A Preferred represent approximately 11.8% of the preferred, and his family's twenty-four shares of preferred stock represent approximately 7.1% of the outstanding preferred.[20] Neither Salamone nor Dura owned any Westech stock during the relevant time period.[21]

Thus, in the absence of the Voting Agreement, Gorman's majority ownership of the Company, even if no other shareholders supported him, would decide the outcome of a board election. As described below, both Gorman and the Incumbents have nominated their preferred slates of directors which were voted upon at a recent annual meeting. Because Gorman's voting power is bound by the director designation provisions in the Voting Agreement, the interpretation of the contested provisions of that agreement will determine whether Gorman's nominees or the Incumbent's nominees were properly elected.

A. *The Voting Agreement*

Although the parties to the 2011 Series A Preferred round executed other agreements,[22] the most significant document for the purposes of this control

---

[18] Stip. ¶¶ II.A.2-.3.
[19] *Id.* ¶ II.A.16.
[20] *Id.* ¶¶ II.A.17-.19.
[21] *Id.* ¶¶ II.A.11-.14.
[22] Certain ancillary provisions within the Voting Agreement and other related documents are considered in the analysis that follows.

dispute is the Voting Agreement. The provisions designating the board members read:

> 1.2 <u>Board Composition</u>. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control . . . to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Board:
>
>> (a) One person designated by Mr. James J. Pallotta ("**Pallotta**") (the "**Pallota [sic.] Designee**"), for so long as Pallotta or his Affiliates continue to own beneficially at least ten percent (10%) of the shares of Series A Preferred Stock issued as of the Initial Closing (as defined in the Purchase Agreement);
>> (b) One person who is an Independent Director and is designated by the majority of the holders of the Series A Preferred Stock (together with the Pallotta Designee, the "**Series A Designees**"[23]);
>> (c) Two persons elected by the Key Holders, who shall initially be John J. Gorman IV and Robert W. Halder (the "**Key Holder Designees**");
>> (d) The Company's Chief Executive Officer, who shall initially be James Benjamin Fellus (the "**CEO Director**"), provided that if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Company, each of the Stockholders shall promptly vote their respective Shares (i) to remove the former Chief Executive Officer from the Board if such person has not resigned as a member of the Board and (ii) to elect such person's replacement as Chief Executive Officer of the Company as the new CEO Director; and
>> (e) Two individuals with applicable industry experience not otherwise an Affiliate (defined below) of the Company or of

---

[23] Throughout the opinion, the "Series A Designees" shall indicate the collective of the two directors, the Pallotta Designee and the second director designated under Section 1.2(b). The term the "Series A Designee" (without an "s") shall indicate the single director designated under Section 1.2(b) and shall not include the Pallotta Designee.

> any Investor and who are Independent Directors mutually acceptable to the Series A Designees and the Key Holder Designees of the Board.
>
> To the extent that any of clauses (a) through (e) above shall not be applicable, any member of the Board who would otherwise have been designated in accordance with the terms thereof shall instead be voted upon by all of the stockholders of the Company entitled to vote thereon . . . .[24]

The introductory paragraph to Section 1.2 thus binds each Voting Agreement signatory to vote in accordance with the more specific designation provisions of Sections 1.2(a)-(e). For convenience, the Court, at times, refers to Sections 1.2(a)-(e) as voting mechanisms; however, the vote under those sections is not the formal election vote of all of the Company's shareholders.[25] These sections define a specific process for designating the directors whom the Series A investors have committed to elect by the introductory paragraph to Section 1.2. Similarly, under the Voting Agreement's removal or amendment provisions, Series A Preferred holders vote their respective shares to determine a course of action which then binds the agreement's signatories.

The "Key Holders" are listed in Schedule B to the Voting Agreement as Gorman, Halder, and Fellus.[26] The Voting Agreement does not define the procedures by which Key Holders are added or removed, and the parties do not

---

[24] Voting Agreement § 1.2 (emphasis in original).

[25] Thus, common shareholders who are not signatories to the Voting Agreement could vote their shares in a director election in any manner they please, even when the Voting Agreement's signatories will be bound by the designation provisions of Section 1.2.

[26] Voting Agreement, Schedule B.

argue that such provisions (or their absence) should be considered when interpreting the agreement.[27]

The Voting Agreement also provides for removal:

> 1.4  Removal of Board Members.  Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control . . . in whatever manner as shall be necessary to ensure that:
>
> (a)  no director elected pursuant to Sections 1.2 or 1.3 of this Agreement may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person, or of the holders of more than fifty percent (50%) of the then outstanding Shares entitled under Section 1.2 to designate that director or (ii) the Person(s) originally entitled to designate or approve such director or occupy such Board seat pursuant to Section 1.2 is no longer entitled to designate or approve such director or occupy such Board seat;
> (b)  any vacancies created by the resignation, removal or death of a director elected pursuant to Sections 1.2 or 1.3 shall be filled pursuant to the provisions of this Section 1; and
> (c)  upon the request of any party entitled to designate a director as provided in Section 1.2(a), 1.2(b) or 1.2(c) to remove such director, such director shall be removed.[28]

The Voting Agreement also contemplates the termination, amendment, or waiver of the agreement in whole or in part under certain circumstances:

> 7.8  Consent Required to Amend, Terminate or Waive.  This Agreement may be amended or terminated and the observance of any term hereof may be waived . . . only by a written instrument executed

---

[27] The Adoption Agreement attached to the Voting Agreement contemplates that Key Holders may transfer shares to transferees, such that the transferee will thereafter be considered a Key Holder.  Voting Agreement, Ex. A § 1.1.  The Court was not directed to and was otherwise unable to locate removal provisions discussing Key Holders in the Voting Agreement or its related documents.

[28] Voting Agreement § 1.4.

by (a) the Company; (b) the holders of a majority of the Shares held by the Key Holders and (c) the holders of two-thirds of the shares of Series A Preferred Stock issued as of the Initial Closing . . . held by the Investors (voting as a single class and on an as-converted basis). Notwithstanding the foregoing:

> (a)  this Agreement may not be amended or terminated and the observance of any term of this Agreement may not be waived with respect to any Investor or Key Holder without the written consent of such Investor or Key Holder unless such amendment, termination or waiver applies to all Investors or Key Holders, as the case may be, in the same fashion; . . .; and
>
> (e)  Section 1.2(a) of this Agreement shall not be amended or waived without the written consent of Pallotta; Section 1.2(b) of this Agreement shall not be amended or waived without the written consent of the holders of a majority of shares of Series A Preferred Stock; and Section 1.2(c) of this Agreement shall not be amended or waived without the written consent of the holders of a majority of Shares held by the Key Holders.[29]

Both of these provisions (Sections 1.4 and 7.8) contain more precisely articulated majority voting standards which read: "holders of more than fifty percent (50%) of the then outstanding Shares" or "the holders of a majority [or of two-thirds] of the Shares . . . ."

B. *The Motivation for the Series A Preferred Financing*

The parties offer competing explanations for the Series A Preferred round of financing. Defendants claim that Gorman's acts drove the Company to seek

---

[29] *Id.* § 7.8.

additional capital to survive.[30] Gorman contends that the Series A Preferred round was pursued to facilitate growth and to permit the acquisition of other broker dealers. The parties argue that the motivation for the round is helpful in understanding the intent of the Voting Agreement.

Gorman asserts that he and Pallotta were the two primary negotiators in determining the board structure under the Voting Agreement because they were the major preferred investors, although he appears to acknowledge that other signatories to the agreement had some involvement in the negotiations. Gorman contends that he approached Pallotta to "lead" the investment.[31] In Pallotta's words, he invested because he was "[t]rying to help [Gorman] out."[32] According to Gorman, the board structure was meant to satisfy his major co-investor:

> Mr. Pallotta's requirements were that if I was going to own less than 50 percent of the company that he wanted to make certain between the two of us that we owned more than 50 percent and that he would have his representative have a seat. And that between me and him we would own a majority of the fully diluted shares.[33]

Gorman further contends that the Key Holder Designee provision was structured to provide additional representation and control to other investors who made significant commitments to the financing round. He argues that the history of

---

[30] The parties have made a variety of colorful accusations about one another's behavior, none of which is particularly relevant to determining the meaning of two imprecisely worded subsections of a voting agreement. These accusations, and the parties resort to them, are perhaps most useful in understanding that the parties have a "history" with one another and share mutual animosity.
[31] Pl.'s Pre-Trial Br. at 7.
[32] Pallotta Dep. 9.
[33] Gorman Dep. 87-88.

negotiations, as evidenced through different drafts of the Voting Agreement and certain emails, supports his description of the negotiators' intent.

Defendants argue that the Voting Agreement was specifically designed to limit Gorman's control over the Company and grant board representation to four investor contingents. The board designation provisions were designed so that the employee investors would have a representative (Halder), the CEO would represent management (Fellus and later Salamone), and Gorman and Pallotta would also have representation as major investors. Pallotta's designated director, Monaco, who negotiated on Pallotta's behalf, indicated that he would have advised against an investment if it were possible for Gorman to purchase additional shares to control the Westech board.[34] Other witnesses on behalf of the Incumbents stated that they also would not have invested had they understood that Gorman could gain control over the Company by becoming a majority shareholder.[35]

Defendants repeatedly refer to a "triumvirate" of parties who represented Westech with the intent to function as a partnership. According to Defendants, Section 1.2(c), the Key Holders provision, created a "triumvirate" of investors and ensured that Halder, Fellus, and Gorman had to compromise on director designees which provided all of Westech's constituents some representation. They also

---

[34] Monaco Dep. 56-57.
[35] Clark Aff. ¶ 13; Halder Aff. ¶ 15; Zimmerman Aff. ¶ 15.

contend that the majority of shares voting provisions found elsewhere in the agreement, for example in the removal and transfer provisions, were set up to function as a set of checks and balances and were consciously designed to create tension with the per capita voting established in Sections 1.2(b) and (c). They argue that the possibility of deadlock would encourage compromise.

## C. *The History of Negotiations*

The negotiating history of the provisions at issue is not particularly illuminating. The Voting Agreement appears to be based on a form agreement which may be found online, although its drafters made alterations to Section 1.2, such that the form agreement's phraseology of "holders of a majority of the shares" was revised.[36] Thereafter, only minor alterations were made to Sections 1.2(b) and (c) throughout different drafts of the documents and those changes are immaterial.[37] One email is somewhat helpful in explaining the Key Holders language in Section 1.2(c). That email, authored by Westech's counsel, indicates

---

[36] An August 2013 draft of this form agreement was hand delivered to the Court at trial. This draft version no longer appears on the New Venture Capital Association's website, although the director designation provisions of the updated model voting agreement contained therein appear to be identical to the version provided by counsel. The newer draft of the Voting Agreement may be downloaded from http://www.nvca.org/index.php?option=com_content&view=article&id=108&Itemid=136. The parties do not argue that the drafters' decision to alter these provisions supported their interpretation of Sections 1.2(b) and (c). However, this argument is closely related to the arguments that were made concerning the drafters' decision to write Sections 1.2(b) and (c) using phraseology different from the majority of shares provisions found elsewhere in the agreement.

[37] *See* JX 4; 6; 9-10 (demonstrating that language of Sections 1.2(b) and (c) were virtually unchanged over three draft versions of the agreement and the execution version spanning the time period of March 2011 to September 2011).

that the negotiators understood the Key Holders to be "significant" investors and Pallotta, and not Halder, was initially listed as a Key Holder.[38]  Furthermore, the email seems to contemplate two "groups"—the Pallotta group and the Gorman group.  The parties provide no contemporaneous evidence explaining why Halder was added to the list of Key Holders or why Pallotta was removed.[39]

Defendants argue that the Company was severely lacking in capital at this time and the investors would not have agreed to invest if Gorman could regain control of the board in the future.  Though they present some evidence that the Company's financial position had declined, they offer no contemporaneous evidence indicating that the parties negotiating the agreements were concerned with preventing Gorman from regaining control of the Company or that the preferred investors participated based on this understanding.

D. *Gorman's Attempts to Gain Control of the Board*

Gorman resigned as a Key Holder Designee director on August 7, 2013.  Defendants assert that he resigned because he was unhappy he could no longer use the Company as a personal piggy-bank due to his loss of control under the Voting

---

[38] JX 10 ("We are contemplating including Fellus, Gorman, Pallotta (and perhaps Ira Lampert and any other significant investor from the Pallotta group as the Key Holders).  In Gorman's group, the next biggest investor is at $250,000.").

[39] After-the-fact testimony has been offered to explain how Halder joined the Board, but, as discussed below, the Court does not find those explanations to be as credible as contemporaneous documentary evidence.

13

Agreement. Gorman claims he resigned because of the Company's bloated operations and Halder's and Salamone's failure to maximize stockholder value.

Soon thereafter, Gorman engaged in a campaign to regain control of the Company. He first acted pursuant to a letter sent to Westech on August 14, 2013 and attempted to remove Halder and replace him with Greg Woodby ("Woodby") as a Key Holder Designee.[40] He also attempted to elect Barry Williamson ("Williamson") to fill the vacant second Key Holder Designee seat.

On August 21, 2013, Gorman, a trust controlled by Gorman's wife, and Pallotta entered into a Stock Purchase Agreement by which Gorman obtained ownership and control of the Pallotta Shares.[41] Contemporaneously with this transaction, Monaco, the Pallotta Designee, resigned from the Company's board.[42] Pallotta issued Gorman a proxy on September 5, 2013 (the "Pallotta Proxy") pending the Company's recognition of the sale of the Pallotta Shares.[43]

On that same date, shareholders Gorman, Arch Aplin ("Aplin"), Williamson, Woodby, and T.J. Ford ("Ford"), by written consent (the "First Consent"), again sought to designate and elect Gorman to the Pallotta Designee board seat.[44] Those same shareholders also attempted to designate and elect Barry A. Sanditen

---

[40] JX 24.
[41] JX 5.
[42] Stip. ¶ II.C.33.
[43] *Id.* ¶¶ II.C.32.
[44] JX 27.

("Sanditen") to the Series A Designee board seat by written consent (the "Second Consent").[45]

On August 23, 2013, Gorman, Sanditen, Woodby, and Williamson, as the purported majority of the board, directed Westech's secretary, Craig Biddle ("Biddle"), to call a meeting of the board to be held on August 26, 2013 at Westech's offices. Gorman alleges that Salamone directed the Westech offices to be locked and the disputed directors appointed by Gorman to be denied access to the premises. As a result, the purported directors Gorman had recently nominated (which excluded Salamone and Dura) conducted the meeting at a nearby location after providing notice to Salamone and Dura. They then voted to remove Dura and elect Daniel Olsen ("Olsen") and Ford to serve as Industry Directors.[46]

On September 17, 2013, the Company held its annual meeting (the "Annual Meeting"). Gorman and the Incumbents nominated opposing slates. Gorman nominated Salamone as CEO Director, Ford and Gorman as the Series A Designees, Woodby and Williams as Key Holder Designees, and Olsen and Sanditen as the Industry Directors. Defendants nominated Salamone, Halder, Dura, Michael Wolf, and Mark McMurray. At the Annual Meeting, the majority of the stockholders voted to elect Gorman's slate. The Preliminary Tabulation Report prepared by an independent inspector of elections, found that Gorman's

---

[45] JX 26.
[46] Stip. ¶ II.C.42.

15

slate received 5,969,288 votes in its favor and that management's slate received 3,375,000 votes in its favor.[47] A review and challenge session conducted by Gorman and Defendants, resulted in the inspector's reaffirmation of the Preliminary Tabulation Report.[48] The question thus remains whether the election vote complied with the terms of the Voting Agreement or whether the preferred investors voted their shares in violation of it.

## III. CONTENTIONS

Gorman argues that the provisions at issue are unambiguous majority of shares voting provisions which permit him to vote his majority stock to designate directors to the Series A Designee and Key Holder Designee seats. If the provisions are ambiguous, however, he argues that the contemporaneous evidence from the negotiations shows that the Voting Agreement's negotiators were unconcerned with per capita voting and made no attempt to prevent Gorman from regaining control of the Company if he purchased shares from other investors.

Defendants argue that the plain language of the Voting Agreement favors a per capita voting scheme, in which each holder of shares or each Key Holder is entitled to a single vote when designating directors regardless of how many shares he or she owns. They argue that if ambiguity exists, the intent of the agreement is evidenced by the tension created by the interplay of the majority of shares

---

[47] *Id.* ¶ II.D.49.
[48] *Id.* II.D.50-.51.

designation mechanisms of the removal and amendment provisions and the per capita designation provisions in Sections 1.2(b) and (c). They argue that the negotiators designed a triumvirate scheme, whereby Halder represented the employee investors, Fellus represented management as the CEO, and Gorman represented his own interests as a significant investor. The various constituents of this triumvirate needed to agree with one another to designate their nominees, and the agreement favored deadlock to prevent one group from acting opportunistically and to limit Gorman's control.

The parties also generally contend that their respective slate of nominees was validly elected at the Annual Meeting. The Court resolves these general contentions at the end of its analysis.

## IV. ANALYSIS[49]

The parties have requested that the Court resolve the meaning of two director designation provisions of the Voting Agreement, Sections 1.2(b) and (c).[50]

---

[49] The litigants include several arguments from their earlier cross motions for judgment on the pleadings. The Court responds to those arguments within this analysis, but also draws forward some arguments from those earlier motions which were not as heavily discussed at trial where it would be helpful to explain how the Court concluded the provisions at issue were ambiguous.

[50] Although the parties ask that the Court declare their respective slate as validly elected, the bulk of the parties' argument and briefing focused on only Sections 1.2(b) and (c) of the agreement. They did not seek to establish the meaning of Section 1.2(e), the Industry Directors provision, or make nuanced arguments based on Section 1.4, the director removal provision. Thus, most of the analysis which follows is primarily concerned with resolving the parties' arguments addressing Sections 1.2(b) and (c). Nonetheless, the Court responds to the parties' general request to determine the validity of the parties' acts to elect their preferred directors after resolving the meaning of Sections 1.2(b) and (c).

17

The Court determined that both provisions were ambiguous when considering the parties' cross-motions for judgment on the pleadings. After trial on a stipulated record and with the benefit of engaging in fact-finding, it concludes that the Voting Agreement's signatories did not make clear in Section 1.2(b) their intent to designate by per capita vote and thus our law's preference for majority of shares voting applies. However, Section 1.2(c), because it appears to be a provision negotiated to empower certain individuals, without reference to their relative status as shareholders, is more likely than not a per capita designation provision.

The votes cast at the Annual Meeting which elected Gorman's candidate to the Series A Designee seat were therefore in accordance with the Voting Agreement and that director was duly elected to the board. However, the record does not demonstrate that the directors on either slate were designated in accordance with Section 1.2(c) and thus neither set of these directors was validly elected.

A. *The Legal Standards*

Matters of contractual interpretation may often be resolved before trial, as a matter of law. When a contract's language is clear and unambiguous, the Court will give the language its ordinary and usual meaning.[51] The Court will consider the intent of the parties to an agreement, looking at the contract as a whole, to

---

[51] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

divine that intent. It also attempts to reconcile all of the contract's provisions when read as a whole, giving effect to each and every term to avoid rendering any particular term illusory or meaningless.[52] When a contract is susceptible to more than one reasonable interpretation, as is the case here, the Court may consult extrinsic evidence.[53] The Court may consider the history of negotiations, earlier drafts of the contract, trade custom, or course of performance. The Court may also consider certain presumptions underlying our law when considering ambiguous provisions.

The Court reviews the parties' arguments concerning Section 1.2(b) and then Section 1.2(c). To do so, it considers the language found within the agreement, the overall structure and intent of the agreement, the extrinsic evidence forwarded by the parties, and certain default presumptions and gap-filling provisions of Delaware law.

B. *The Meaning of Section 1.2(b)*

The Court must first determine the meaning of the language found in Section 1.2(b) of the Voting Agreement, which reads as follows:

> (b)    One person who is an Independent Director and is designated by the majority of the holders of the Series A Preferred Stock (together with the Pallotta Designee, the "**Series A Designees**");

---

[52] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *7 (Del. Ch. Dec. 22, 2010).

[53] *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 339 (Del. Ch. 2008).

Interestingly, despite the Court's earlier ruling that the provision is ambiguous, both Gorman and the Incumbents argue that the provision is unambiguous. They do, however, also make additional arguments based on the limited extrinsic evidence available.

The Court first considers Gorman's most compelling arguments which explain that Section 1.2(b) supports a majority of shares voting mechanism based on the intent and overall scheme of the agreement. It next considers the extrinsic evidence and concludes that it slightly favors Gorman and undermines Defendants' theory. It then considers a default presumption surrounding majority of shares and per capita voting. Finally, the Court explains why it rejects Defendants' theory that Section 1.2(b) embodies a per capita voting mechanism.

1. <u>The Language of Section 1.2(b) and the Overall Structure of the Voting Agreement</u>

Gorman contends that the signatories to the Voting Agreement intended for Section 1.2(b), like the other voting mechanisms in the agreement, to provide for majority of shares voting. Specifically, he argues that Delaware courts or statutory enactments have used the phrases "majority of the holders" and "holders of the majority" interchangeably. He also argues that because Section 1.2(b) is at odds with all other voting provisions within the agreement, the provision was intended to mean the same thing. Because the provision can be bypassed by transferring the Series A Preferred into a multitude of subsidiaries or affiliates to manufacture a

20

majority, he contends that it fails to function effectively as a per capita designation mechanism and demonstrates that the agreement's negotiators did not write a per capita provision. To evaluate this argument, the Court considers the transfer restrictions of the Voting Agreement and its related agreements to determine whether they were intended to reinforce a per capita vote and prevent Gorman's domination of the board as Defendants assert.[54]

Gorman argues that the principle of contract interpretation which requires a contract to be interpreted as a whole and given reasonable effect compels the Court to reject Defendants' interpretation which creates an unreasonable result. Stated more strongly, "Delaware courts will not allow sloppy grammatical arrangement of the clauses or mistakes in punctuation to vitiate the manifest intent of the parties as gathered from the language of the contract."[55]

Gorman first directs the Court to an array of examples of Delaware courts using the phrase "majority of the holders" to describe a majority vote.[56] These

---

[54] Gorman also argues that Defendants' per capita voting theory would be invalid as a matter of law because the Delaware General Corporation Law ("DGCL") requires all per capita voting provisions to be set forth in the corporation's charter. The Court considers this argument when evaluating Section 1.2(c).

[55] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *7 n.62 (Del. Ch. Dec. 30, 2010).

[56] *See, e.g.*, *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *25 (Del. Ch. Oct. 11, 2013) ("The first exception permits a party to the Stockholders' Agreement to act to remove a director without cause if 'such removal is directed or approved by the affirmative vote of the Person, or of the holders of a majority of the shares of Capital Stock, entitled under Section 9.2 to designate that director.' Thus if a majority of the holders of the Series A Preferred directed or approved the removal of one or more Series A Directors, or if the holder of a majority of the common stock directed or approved the removal of the Common Director, then any party to the Stockholders'

21

cases and the colloquial or imprecise articulations of a majority voting provision found within them do not compel a conclusion that Gorman's interpretation of Section 1.2(b) is the correct one. However, they permit the Court to determine that the language of Section 1.2(b) could encapsulate majority of shares voting despite its literal interpretation. This less precise use of language could be likened to the commonly used phrase "shareholder vote." Although it could be construed as a measure of how each shareholder voted, it is usually understood to mean a tabulation of how shares were voted and not as a count of how each individual shareholder voted.

---

Agreement could exercise the right it otherwise held under the Charter and Bylaws to seek to remove the director without cause."); *Dawson v. Pittco Capital P'rs, L.P.*, 2012 WL 1564805, at *11 & *19 (Del. Ch. Apr. 30, 2012) (using "majority of the holders" and "holders of a majority" interchangeably); *Telcom-SNI Investors, L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *6 & n.20 (Del. Ch. Sept. 7, 2001) (describing "right to waive upon approval by holders of more than 50% of the Series A Preferred" as "a majority vote of the holders"), *aff'd*, 790 A.2d 477 (Del. 2002); *Solomon v. Armstrong*, 747 A.2d 1098, 1127 (Del. Ch. 1999) ("The consummation of the split-off of EDS was contingent upon obtaining the approval of a majority of the holders of each of (1) GM 1–2/3 stock, voting separately as a class, (2) GM Class E common stock, voting separately as a class, and (3) all classes of common stock, voting together."), *aff'd*, 746 A.2d 277 (Del. 2000); *Margolies v. Pope & Talbot, Inc.*, 12 Del. J. Corp. L. 1092, 1097 (1986) ("The Board of Directors of Pope & Talbot conditioned the implementation of the Plan of Distribution upon the approval of a majority of the holders of the company's outstanding shares of common stock. If, however, directors, officers or affiliates voted in favor of the Plan of Distribution, it was required that up to an additional 27.1% of the outstanding shares be voted in favor of the Plan, in order to counter the effect of votes by the directors, etc."); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 14 Del. Ch. 1, 120 A. 486, 490 (1923) (citing a former DGCL section which apparently used "holders of the majority of the stock issued" synonymously with "majority of the holders of the voting stock issued").

Gorman also argues the other voting provisions within the agreement utilize majority (or supermajority) of shares voting mechanisms[57] and therefore the Voting Agreement's drafters intended this provision to function similarly. He contends that the drafters' use of majority voting provisions elsewhere throughout the agreement is stronger evidence of intent than Defendants' triumvirate theory and theory of checks and balances. Again, Gorman's contention is inconclusive.[58] However, he supports these arguments with additional persuasive reasoning.

Gorman asserts that the amendment and removal provisions of the Voting Agreement apply majority or supermajority voting and are therefore inconsistent with per capita elections. A majority holder could remove any director elected through a per capita vote or amend or waive Sections 1.2(b) or (c).[59] Gorman

---

[57] *See* Voting Agreement §§ 1.4(a) ("the holders of more than fifty percent (50%) of the then outstanding Shares"); 4.1 ("shares representing more than fifty percent (50%) of the outstanding voting power of the Company"); 4.2 ("the holders of at least two-thirds (66 2/3%) of the shares of the Series A Preferred Stock"); 4.4 ("the holders of at least two-thirds of the Series A Preferred Stock"); 7.8 ("the holders of two-thirds of the shares of Series A Preferred Stock"); 7.8(e) ("the holders of a majority of shares of Series A Preferred Stock"). Although one phrase within Section 4.4 uses the more general term "holders," that portion of the provision is not a voting provision.

[58] The language could permit the Court to ascertain a separate meaning and intent in this provision, because other provisions within the agreement use different terms elsewhere to describe a similar phenomenon. However, the language could also support a conclusion that the parties to the Voting Agreement used a multitude of terms, perhaps to improve readability, perhaps out of loss of focus, but they all are intended to be enactments of a majority or supermajority voting scheme and where only one per capita provision is present, perhaps it was simply an outlier.

[59] Perhaps Gorman overstates his ability to amend or waive the provisions of Section 1.2(b) (or Section 1.2(c)) because the introductory paragraph to Section 7.8 could be interpreted to require a supermajority vote or Company consent. However, Gorman appears to describe his powers to remove directors more accurately because he controls a majority of the voting power under those provisions.

23

argues these provisions do not create a workable triumvirate structure or scheme of checks and balances and instead produce deadlock. Defendants' argument that the drafters could have intended to create compromise through checks and balances is plausible, but the Court concludes that Gorman's theory is more credible. The drafters likely would have wished to avoid creating a structure which invites deadlock. Alternatively, they could have adopted a more effective system of checks and balances or better explained their intent if they thought that deadlock was the best way to ensure compromise.

Gorman's most convincing argument, based on the agreement's structure, may be that the transfer restrictions contained within the Series A Preferred agreements are permissive and therefore at odds with Defendants' interpretation of Section 1.2(b). If a per capita requirement were designed to prevent Gorman from dominating Westech, reflected a considered set of checks and balances, or sought to empower members of the triumvirate who held fewer shares than Gorman, then the Voting Agreement would also need to prevent him from transferring shares to bypass the per capita vote mechanism. Gorman argues that he, or any other preferred shareholder, could engage in transactional arbitrage by creating a series of affiliates, transferring shares into them, and then voting the shares controlled by each separate affiliate to convert the per capita vote into a majority of shares voting

24

mechanism. This would make Defendants' preferred reading ineffective and thus could not have been the drafters' intent.

The Voting Agreement and its related documents do not have transfer restrictions which would allow a per capita voting mechanism to function effectively. The Voting Agreement[60] and its related documents such as the Co-Sale Agreement[61] and the Investors' Rights Agreement[62] do not meaningfully attempt to limit transfers to affiliates or assignees.

Defendants offered a new theory in anticipation of trial when they argued that Section 7.17, found within the "Miscellaneous" article of the Voting Agreement and entitled "Aggregation of Stock," would cause any transfers to be treated as a single vote for per capita voting purposes. The provision reads: "All

---

[60] Sections 7.2 and 4.4 of the Voting Agreement appear to be primarily concerned with transfers. Section 7.2 requires transferees or assignees of shares subject to the agreement to agree to the terms of the Voting Agreement and to sign an Adoption Agreement. Section 4.4 allows participation by the minority if over 50% of the Company's voting power is sold. Additional provisions providing for drag-along rights are also present to facilitate a sale of Westech upon certain conditions, but such provisions do not include additional transfer restrictions and seek to ensure minority investors will be forced along in such a stock sale transaction. *See* Voting Agreement §§ 4.1-.3.

[61] JX 21. Defendants argued during an earlier hearing and in their pretrial brief that Section 2.1 of the Co-Sale Agreement prohibits transfers to affiliates. Although the Co-Sale Agreement arguably may be implicated by such a transfer, it appears to be primarily concerned with allowing other investors to participate pro rata in a transfer of shares to the affiliates or assigns of Gorman, which would not prevent Gorman from converting the per capita provision into a majority voting provision. *See id.* § 2.1. The Co-Sale Agreement does not appear to be concerned with affiliate transactions or assignments and instead is seemingly intended to allow other investors to participate in a sale if a Key Holder sought to exit her investment.

[62] JX 22. The Investors' Rights Agreement appears to be intended to ensure compliance with securities law and has no particular restrictions on transfers or assignments of stock, so long as they are not in violation of such laws. Furthermore, it explicitly contemplates transfers and assignments to affiliates. *See id.* §§ 2.12(c), 6.1.

Shares held or acquired by an Investor and/or its Affiliates shall be aggregated together for the purposes of determining the availability of any rights under this Agreement, and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate."[63] The first clause of the provision is expansive and aggregates "all" shares for the purposes of "any" rights in the agreement. However, the second clause grants affiliated persons the ability to apportion "such" rights (those expansively stated in the first clause) among themselves in any manner they please. Thus, to the extent some aggregation of rights, such as voting rights, occurs, affiliated persons appear to be able to apportion them in a similarly expansive manner.

Furthermore, this clause appears in nearly the exact same format in the form agreement which the Voting Agreement's drafters appear to have used as the model for this agreement.[64] The equivalent of Section 1.2 in the form agreement does not use the term "majority of the holders" and instead uses the more precise "holders of a majority of the shares" in its designation provisions. Thus, Section 7.17, as drafted in the form agreement, cannot have been written to cause

---

[63] Voting Agreement § 7.17.

[64] *See supra* note 36. The only difference between the two provisions is that the form agreement uses the term "Stockholder" where Section 7.17 of the Voting Agreement uses the term "Investor."

26

investors' shares to be treated as a single vote for per capita voting purposes because per capita voting is not contemplated in the form agreement.[65]

Thus, the transfer and assignment provisions which function in the background of Section 1.2(b) do not appear to be part of a scheme to ensure the successful operation of a per capita voting mechanism. A per capita vote could be converted into a majority of shares vote if a preferred holder created a series of affiliates and moved each of his individual shares into those entities to be designated as a "holder" under Section 1.2(b). Moreover, several terms of the related agreements contemplate affiliate transfers or assignments. The overall scheme of the contracts therefore supports Gorman's view that Section 1.2(b) is a majority voting provision.

Section 1.2(b), therefore, is more likely than not a majority voting provision. However, because it is not unambiguous, the Court proceeds to consider the extrinsic evidence offered by the parties and our law's presumption favoring majority voting.

2. The Extrinsic Evidence Concerning Section 1.2(b)

Both sides offer conflicting accounts of the intent of the signatories to the Voting Agreement through depositions and affidavits. Some of these accounts

---

[65] Of course, the drafters of the Voting Agreement could have reviewed the provision and determined it met the need of reinforcing their per capita voting provision. However, Defendants' interpretation of Section 7.17 does not appear to reflect its most obvious meaning and the drafting history reinforces the conclusion that this section likely serves another purpose.

may be motivated by their mutual dislike or by the opportunity to gain financially. Some accounts are less overtly self-interested, but, nonetheless, the testimony and affidavits from litigation are less persuasive than contemporaneous evidence from negotiations or the drafting history of the agreements. This subsection discusses certain evidence concerning the Key Holder Designees section, which will be referred to when evaluating Section 1.2(c), because it is pertinent to understanding Defendants' broader arguments, applicable to Section 1.2(b), about the drafters' intent.

Defendants explain that the Voting Agreement was carefully negotiated to create a triumvirate structure and was finely wrought to create a system of checks and balances. They support their position solely through depositions and affidavits. There is nothing inherently wrong with Defendants' theory; however, their inability to support their conclusions with any contemporaneous negotiating history undermines their account.[66] They argue that Halder's addition to the Key Holder list was heavily negotiated and evidence that he was added to grant the employees board representation. Again, they direct the Court to no contemporaneous evidence to support this claim.

---

[66] Defendants' inability to provide any contemporaneous supporting documentation that favors their position is curious.

28

Conversely, Gorman presents evidence that Section 1.2 changed little during the drafting effort.[67] This undermines Defendants' theory of the case: there is no evidence of heavy negotiations, of a decision to use per capita voting, or of the drafters' intent to prevent Gorman from later re-acquiring majority control over the Company.

Moreover, the drafters were apparently concerned with providing representation for significant investors, but demonstrated no particular consideration for the employee investors. At least one email, which Defendants do not counter with contemporaneous evidence, indicates that the Key Holder Designees were intended to grant "significant" investors additional board representation.[68] Pallotta and a few other major investors were contemplated as possible key investors, although Halder was not mentioned. Additionally, the email appears to focus on two "camps"—a Gorman camp and a Pallotta camp. This email is again at odds with Defendants' version of the negotiators' intent, and again, despite extensive discovery, they have not countered it except through after-the-fact testimony from interested individuals.

---

[67] Gorman introduces various drafts of the Voting Agreement which did not materially change throughout negotiations. *See* JX 4; 6; 9-10 (demonstrating that language of Sections 1.2(b) and (c) were virtually unchanged over three draft versions of the agreement and the execution version spanning the time period of March, 2011 to September 2011).

[68] JX 10 ("We are contemplating including Fellus, Gorman, Pallotta (and perhaps Ira Lampert and any other significant investor from the Pallotta group as the Key Holders). In Gorman's group, the next biggest investor is at $250,000.").

In weighing the parties' competing accounts, the Court finds the contemporaneous evidence Gorman sponsors to be more credible than the ex post explanations Defendants offer. The documentary evidence from the drafters' negotiations does not support Defendants' triumvirate theory or their checks and balances theory. Rather, they are undermined by the negotiators' focus on providing representation for major investors.

Thus, in the absence of compelling evidence from the Defendants demonstrating the drafters' intent and because the extrinsic evidence slightly favors Gorman, the Court reaffirms its conclusion that Section 1.2(b) is more likely than not a majority voting provision. At a minimum, it does not clearly evidence its intent to function as a per capita voting mechanism as our law would require.

3. The Presumption Against Disenfranchising a Majority

Gorman also argues that voting agreements which disenfranchise the majority of the corporate electorate must clearly state their intent to do so. He cites *Rohe v. Reliance Training Network, Inc.*, which explains that "although Delaware law provides stockholders with a great deal of flexibility to enter into voting agreements, our courts rightly hesitate to construe a contract as disabling a majority of a corporate electorate from changing the board of directors unless that reading of the contract is certain and unambiguous."[69] *Rohe* also invokes *Rainbow*

_____

[69] *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *16 (Del. Ch. July 21, 2000).

*Navigation, Inc. v. Yonge*, in which the Court observed "[i]t is enough to note that an agreement, if it is to be given such an effect [which deprived a majority of shareholders of power to elect directors at an annual meeting or through written consent], must quite clearly intend to have it. A court ought not to resolve doubts in favor of disenfranchisement."[70]

Gorman argues that under Defendants' interpretation of the Voting Agreement, holders of less than three percent of the outstanding capital stock could control Westech at the expense of Gorman who is a majority holder. He contends that Section 1.2(b) does not clearly support per capita voting and thus *Rohe* and its predecessor *Rainbow Navigation* apply.

Gorman persuasively advances our law's presumption in this area. To the extent any ambiguity remains based on the structure of the agreement and the extrinsic evidence, Section 1.2(b) does not make clear that it is a per capita voting mechanism and our law's presumption will therefore resolve any remaining ambiguity to interpret the provision as requiring a majority of shares vote. Though the Defendants point out that the drafters could have more clearly articulated their desire for a majority voting provision if that was their intent, the opposite is also true: the drafters of the agreement, had they intended Section 1.2(b) to require a per capita vote, could have used the phrase "per capita" or comparable wording

---

[70] *Rainbow Navigation, Inc. v. Yonge*, 15 Del. J. Corp. L. 196, 204 (1989).

somewhere within the provision (or elsewhere in the agreement) to guarantee that its interpreters would reach the desired conclusion.[71]

   4. Defendants' Unpersuasive Arguments that Section 1.2(b) Is a
      Per Capita Voting Provision

Defendants argue that under the plain meaning of Section 1.2(b) the Series A Designee is to be designated on a per capita basis, without regard to the percentage of Series A stock owned by those holders. They earlier contended that the language "the *majority of the holders* of the Series A Preferred" is different from certain language the parties should have been aware of because of its use within the DGCL, such as "a *majority of the outstanding* stock,"[72] or "the *holders of a majority of the outstanding* stock,"[73] or "the *holders of a majority of the shares*"[74] of such stock. Thus, the parties to the Voting Agreement must have consciously declined to use the language relied upon by the DGCL which describes a majority vote and instead agreed upon the language used in Section 1.2(b) to memorialize their choice of per capita voting.

Similarly, Defendants argue that the agreement's negotiators used language in Section 1.2(b) which differs from terminology used elsewhere in the agreement

---

[71] Even the language of Section 1.2(b) as written could have evidenced the drafters' intent to function as a per capita provision, assuming other provisions in the agreement or some other shred of extrinsic evidence supported Defendants' theory.
[72] *See* 8 *Del. C.* §§ 242(b)(1), 251(c), 275(b).
[73] *See* 8 *Del. C.* § 271(a).
[74] *See* 8 *Del. C.* § 141(k).

to describe votes of the majority of the shares.[75]  Because the drafters knew how to write a majority or supermajority voting provision, their decision to write "holders" in Section 1.2(b) is proof that its meaning cannot be the same as a majority voting provision.[76]

Next, the Defendants point to the definition of "holder" in Black's Law Dictionary.  Defendants direct the Court to the third definition of "Holder" as "[a] *person* who possesses or uses property."[77]  Thus, the proper interpretation of "the majority of the holders of the Series A Preferred," is that of the vote of a majority of the persons who possess or use property, *i.e.*, a per capita vote of the Series A Preferred holders.

A plain reading by a reasonable third party that inquires no further would support Defendants' per capita voting theory.  However, their theory ignores the broader arguments about the agreement's structure and intent discussed above.  Thus, the more likely conclusion is that Section 1.2(b) was simply poorly drafted in such a way as to invite the present litigation, but reflective, when considered as a whole, of a majority vote provision.

---

[75] *See supra* note 57 & accompanying text.
[76] This is the opposite of Gorman's earlier argument that the agreement's drafters meant the same thing, but inadequately expressed their intent.
[77] Black's Law Dictionary (9th ed. 2009) (emphasis added).

Finally, as mentioned above, Section 1.2(b) fails to comply with our law's requirement that per capita provisions be written clearly and unambiguously. For the reasons set forth above, Section 1.2(b) is a majority of shares voting provision.

C. *The Meaning of Section 1.2(c)*

The parties next dispute the meaning of Section 1.2(c) of the Voting Agreement which calls for the selection of the Key Holder Designees through the following terse mechanism: "[t]wo persons elected by the Key Holders . . . ."[78] The provision turns on the appropriate definition to be applied to the term "elected," which the drafters of the agreement did not define or contextualize.

Again, the analysis proceeds by first looking at the language and structure of Section 1.2(c) and the Voting Agreement and then considering the extrinsic evidence offered by the parties. Finally, the Court explains why it rejects Gorman's less persuasive arguments concerning this provision.

1. The Language of Section 1.2(c) and the Overall Structure of the Voting Agreement

Here, the plain meaning of "elect" does little to resolve the specific application of the word in this context as the term is a general one which encompasses several means of election: unanimous election, majority of shares

---

[78] Voting Agreement § 1.2(c).

34

election, or per capita election.[79]  The Court thus seeks the plain meaning by interpreting the contract as a whole and searching for its drafters' intent. Defendants again point out that certain clauses within the Voting Agreement more precisely state that the voting mechanism is based upon the number of shares held by the Key Holders.[80]  Again, the Court finds this to be inconclusive as applied to this agreement as it could be consistent with the drafters' intent to apply a per capita voting mechanism in Section 1.2(c) or be consistent with overly hasty drafting (which unfortunately appears elsewhere in the agreement).

Here, the problem in which a party to the agreement can simply engage in transactional arbitrage to avoid the provision is lessened, although perhaps not entirely removed, because the Key Holders are three natural persons whose names are set forth in a schedule to the Voting Agreement.[81]  The application of the transfer restrictions to the Key Holders and the processes for adding or removing Key Holders are also unclear which makes determining the drafters' intent by reference to the agreement as a whole more challenging than was the case with Section 1.2(b).[82]

---

[79] The term is particularly inapposite because Sections 1.2(a)-(e) are designation provisions, while the introductory paragraph binds the Voting Agreement's signatories to act to elect directors in accordance with the agreement's designation provisions.

[80] *See* Voting Agreement §§ 4.3(e) ("the Key Holder Shares"); 7.8 & 7.8(e) ("the holders of a majority of the Shares held by the Key Holders").

[81] *Id.*, Schedule B (naming Gorman, Halder, and Fellus as Key Holders).

[82] The Court was not directed to any particular terms in the Voting Agreement or in related agreements contemplating the addition or removal of Key Holders.  There do not appear to be

The removal provisions which permit a majority holder of the shares to remove a director elected by a per capita vote, as with Section 1.2(b), appear to invite deadlock. Thus, Gorman appears to have been granted unilateral power to remove the Key Holder Designees, whether Section 1.2(c) is a majority of shares or per capita provision. One could conclude that the removal provisions are part of a scheme of checks and balances or that the agreement's drafters wrote Section 1.2(c) to function as a majority of shares voting provision to mirror the agreement's removal provisions.

Defendants argue that the drafters could not have intended a majority of shares vote because Gorman owned a majority of the Key Holder shares when the Voting Agreement was executed. His majority ownership would have guaranteed that Gorman's candidates would win any election under this provision and it would function instead as a "Gorman Designee" provision. Defendants contend that the provision would therefore create a meaningless structure of Key Holders, since the votes of Halder and Fellus would be irrelevant when cast alongside Gorman's majority, and should not be read to create such a result.

Based upon the plain language of the provision and the scheme of the agreement as a whole, the Court agrees with the Defendants. The Key Holder

---

any limitations preventing affiliates from becoming Key Holders and the Adoption Agreement appears to contemplate the possibility of Key Holders transferring shares. *See supra* note 27. The amendment and waiver provisions are also unhelpful for the same reasons discussed when considering Section 1.2(b). *See supra* note 59.

36

Designee section should be construed to avoid the illogical interpretation which turns it into a "Gorman Designee" provision. This conclusion is supported by the fact that the list of Key Holders in Schedule B consists of three natural persons and no reference is made to their relative ownership. Gorman is correct that the unilateral veto he appears to have over these directors because of the removal provision is in tension with Defendants' per capita theory. Nonetheless, the Court concludes that it is better to read Section 1.2(c) to give some effect to the drafters' choice to list the names of the three Key Holders, than to read them out of existence by interpreting the provision as a Gorman Designee provision. The Court prefers a reading which avoids producing an absurd result or which no reasonable person would have accepted when entering the contract.[83]

Furthermore, the logical import of an election provision which names three natural persons seems to be that the three of them will be able to name candidates and command equal voting power when designating them. The result is different here from the result under Section 1.2(b) because of the specificity with which the three Key Holders are identified. The Court is satisfied that this provision represents an attempt to assure an important constituency representation on the board and thus differs from a more general provision such as that found in Section 1.2(b), which is aimed at Series A holders generally.

---

[83] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

Nonetheless, the Court proceeds to consider the extrinsic evidence and Gorman's less compelling arguments.

2. The Extrinsic Evidence Concerning Section 1.2(c)

The same general observations made above concerning the extrinsic evidence that the parties presented are equally applicable to Section 1.2(c). Thus, here, as there, the extrinsic evidence is generally not supportive of Defendants' triumvirate theory, although it also does not provide definitive proof that Gorman's account of the negotiations is correct.

However, as mentioned above, Gorman brought to the Court's attention one email from the drafters' negotiations which states: "We are contemplating including Fellus, Gorman, Pallotta (and perhaps Ira Lampert and any other significant investor from the Pallotta group as the Key Holders). In Gorman's group, the next biggest investor is at $250,000." Again, the email appears to contemplate two main factions, a Gorman faction and a Pallotta faction and is focused on granting representation to significant investors.

Thus, the negotiating history could be read as evidence that the signatories intended Section 1.2(c) to function as a tie-breaking mechanism between the Gorman and Pallotta camps or simply as a means of granting representation to significant investors. Both of these theories appear to undermine Defendants' triumvirate theory and the email does not suggest an escalated concern with

38

providing employees board representation or limiting Gorman's future power over the Company. However, as negotiations proceeded, Pallotta's name was ultimately removed and Halder's was added in its place. These changes could represent a rejection of whatever thinking the email evidences or could reflect a differing view of who should be considered a significant investor over time.

This single email provides some limited insight into the thinking of the drafters of the Voting Agreement. However, the Court concludes that whatever insights may be drawn from it do not dislodge the conclusion reached above regarding the drafters' intent based upon the plain text and structure of the agreement.

3. Gorman's Unpersuasive Arguments that Section 1.2(c) Is a Majority Voting Provision

Gorman makes several additional arguments to the effect that Section 1.2(c) is a majority of shares voting provision. First, Gorman asserts that a general principle of Delaware law, which was applied to resolve an ambiguous charter provision, functions as a gap-filler to explain how the Court should interpret "elect." He argues that the principle that "[o]utstanding among the democratic processes concerning corporate elections is the general rule that a majority of the votes cast at a stockholders' meeting, provided a quorum is present, is sufficient to

39

elect Directors"[84] is directly applicable here to resolve the meaning of the word "elect" as used by the signatories to the Voting Agreement.

The Court is not persuaded that a gap-filler applied to resolve an ambiguous charter provisions is equally applicable to the contract provision at issue.[85] A contract must be reviewed for its plain meaning to arrive at the drafters' intent, as Delaware law typically requires. Where a better reading of the parties' intent exists, that reading is applied. That analysis was performed above and the application of this gap-filling provision used to resolve a corporate charter will not trump it.[86]

Gorman next contends that Defendants' per capita voting theory would be invalid as a matter of law because the DGCL requires corporations to specify their election to use per capita voting in their charters. He argues the plain language of 8 *Del. C.* § 212(a) requires such a result,[87] as does the pertinent case law on point.[88] However, Gorman's argument is inconsistent with the broad provisions found in

---

[84] *Standard Power & Light Corp. v. Inv. Assocs., Inc.*, 51 A.2d 572, 576 (Del. 1947).

[85] This does not preclude the possibility that charter or bylaw gap-fillers may apply. However, the arguments as to the applicability of *Standard Power* to the facts at issue were not as fully developed as perhaps they could have been.

[86] Gorman does not argue that *Rohe* or *Rainbow Navigation* apply to resolve any ambiguity found here where three named individuals were empowered by the signatories to determine the Key Holder Designees.

[87] "Unless otherwise provided in the certificate of incorporation and subject to § 213 of this title, each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder." 8 *Del. C.* § 212(a).

[88] *Providence & Worcester Co. v. Baker*, 378 A.2d 121, 123 (Del. 1977) ("Under [§] 212(a), voting rights of stockholders may be varied from the 'one share-one vote' standard by the certificate of incorporation.").

8 *Del. C.* § 218, allowing stockholders to "vote shares as provided by [their] agreement."[89]  As recent case law has articulated, "the Charter and Bylaws allocate various rights to the different classes of stockholders, then the Stockholders' Agreement adds a contractual overlay that constrains the manner in which parties to that agreement can exercise their rights."[90]

Thus, under 8 *Del. C.* § 212, a company must announce its intent to diverge from the typical one-share one-vote scheme within its charter for the purposes of altering the general mechanism by which shareholders act.  However, shareholders are permitted to construct a contractual overlay on top of that mechanism to agree to vote their shares in accordance with that more specific scheme.  So it is here.  Gorman has not argued that Westech's charter does not support a one-share one-vote scheme as he cannot.  Rather, he attempts to use Section 212 to abrogate the broad contractual powers shareholders are granted under Section 218 to create an additional overlay on top of the corporation's voting scheme for the purposes of general shareholder votes.  The Court rejects his argument.  The signatories to the Voting Agreement are permitted to agree to vote their shares (each of which has a one vote per share feature articulated in the Company's foundational documents) according to whatever terms they choose assuming they do not otherwise violate the terms of Section 218 or other Delaware law.

---

[89] 8 *Del. C.* § 218(c).
[90] *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *22 (Del. Ch. Oct. 11, 2013).

Gorman forwards a related argument, that the voting rights of the Voting Agreement's signatories are stated in the Company's Certificate of Designation, which provides for majority voting and thus the Court cannot find in Defendants' favor.[91] Gorman correctly states the law, but the general statements he quotes only go so far. The Certificate of Designation describes the mechanism for the election and permits each shareholder one vote per share. The Voting Agreement does not inhibit its signatories from casting one vote per share; it simply binds them to cast each of those votes in accordance with the provisions found in the agreement.

Finally, Gorman asserts that the Court could not conclude that Gorman would consent to the terms of the Voting Agreement because it grants Fellus and Halder, who contributed less than three percent of the capital raised under the Series A round, a veto power over two board seats. Similarly, he argues that he would not have invested in the Series A round to lose control over the Company. The Court disagrees. Gorman could certainly have decided it was in his best interest to raise additional capital for the Company and agreed in exchange to some dilution of his control. Thus, the Court defers to its earlier conclusions that

---

[91] Pl.'s Pre-Trial Br. at 32-33 (citing *In re Appraisal of Metromedia Int'l Gp., Inc.*, 971 A.2d 893, 899 (Del. Ch. 2009) ("A preferred shareholder's rights are defined in either the corporation's certificate of incorporation or in the certificate of designation, which acts as an amendment to a certificate of incorporation.")); *Matulich v. Aegis Commc'ns Gp., Inc.*, 2007 WL 1662667, at *5 (Del. Ch. 2007) ("If a certificate of designation is silent as to voting rights, then preferred shareholders have the same rights as common stock, and such rights may only be derogated by a clear and express statement."), *aff'd*, 942 A.2d 596 (Del. 2008).

Section 1.2(b) is a majority voting provision and Section 1.2(c) is a per capita vote between the Key Holders.

D. *The Consequences of the Annual Meeting and Gorman's Other Attempts to Control the Board*

Because Gorman commanded a majority of the vote and thus was entitled to designate directors under Section 1.2(b), the Court finds that Ford was duly elected as the Series A Designee at the Annual Meeting.[92] Additionally, although the parties gave only limited focus to the Pallotta Designee seat, Gorman's undisputed authority over the Pallotta Proxy permitted him to vote the Pallotta Shares at the Annual Meeting. Thus, whether Gorman voted the Pallotta Proxy pursuant to Section 1.2(a) or under the general terms of Section 1.2, if Section 1.2(a) became ineffective upon the sale of the Pallotta Shares,[93] he had the authority or the voting majority to validly designate himself to the Pallotta Designee seat. However, there is no evidence that either Gorman's slate or the Incumbents' slate designated Key Holder Designees in accordance with Section 1.2(c). Thus, those positions were not filled at the Annual Meeting.

---

[92] Gorman's earlier acts by written consent to elect the Series A Designees are mooted by the results of the Annual Meeting; however, the fact that the Pallotta Proxy was not executed at this time would appear to cause Gorman and the other parties to the written consents to lack the requisite majority under Section 1.2(b). The additional 22 preferred shares owned collectively by Aplin, Williamson, Woodby, and Ford, the other signatories to the written consents, when added to Gorman's 72 preferred shares, do not grant them a majority of the Series A Preferred.

[93] The Court need not decide the issue because Gorman's control over the Pallotta Proxy would have granted him the Pallotta Designee seat whether Section 1.2(a) was, or was not, still effective.

The parties also request that the Court decide whether or not Gorman's actions in August were valid, although they offered limited guidance at trial and in their pre-trial briefing. The Court's evaluation of Gorman's acts depends on the interpretation of the Voting Agreement's removal provision (Section 1.4) and also the interpretation of the Industry Director designation provision (Section 1.2(e)). The parties' arguments concerning Section 1.4 were limited to explanations of how the provision should influence the Court's assessment of how Sections 1.2(b) and (c) function, and they did not engage in a textual analysis of the provision or make arguments concerning how it operated within the agreement as a whole. The parties did not make arguments concerning the appointment or removal of the Industry Directors.

The Court thus finds, based on the stipulated record, that Gorman removed Halder on August 14. Section 1.4(a) permits the holders of more than fifty percent of the then outstanding shares (which includes the holder's common shares) entitled under Section 1.2 to designate a director to remove that director.[94]

---

[94] Section 1.4(a) uses the defined term "Shares," which is defined as "any securities of the Company the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock . . . and Series A Preferred Stock." Voting Agreement § 1.1. Thus, Section 1.4(a) permits inclusion of the Key Holder's common stock for the purposes of removing the Key Holder Designee, because no specific limitation appears in Section 1.2(c). This result differs from the interpretation of Section 1.4(a) in reference to the removal of the Series A Designee. There, only the preferred shares may be considered in removing that designee because Section 1.4(a) limits the shares considered for the purposes of establishing a majority for removal purposes to those "entitled under Section 1.2 to designate that director." Section 1.2(b) only permits preferred shares to be considered when designating

According to the stipulated record, Fellus and Halder controlled, directly or indirectly 73 Series A units and Gorman controlled 72 such units or convertible notes before he purchased the Pallotta Shares.[95]  Gorman also controlled 2.4 million shares of common stock, by Defendants' concession, the majority of the common before the preferred shares were issued.[96]  Thus, although Fellus's and Halder's combined preferred holdings appear to have outweighed Gorman's holdings, when Gorman's common shares are also included he acted as the holder of more than fifty percent of the outstanding shares entitled to elect the Key Holder Designee to remove that director.  Nonetheless, Gorman's attempt to elect Woodby and Williamson through that same letter was invalid because he has not demonstrated that he had the consent of either Fellus or Halder, which he needed to make valid designations under Section 1.2(c).

The Court also concludes that Gorman's acts on August 26 to remove Dura and to elect Olsen and Ford as Industry Directors were invalid.  Section 1.2(e) requires that the Industry Directors be mutually acceptable to the Series A Designees and the Key Holder Designees.  The Court concludes, in the absence of argument by the parties, that this provision was designed to protect the disparate

---

the Series A Designee and thus Section 1.4(a) is constrained by the requirement set forth in Section 1.2(b).

[95] This may be a generous accounting of the combined holdings of Fellus and Halder given that Fellus apparently never made payment upon the promissory note granting him 40 preferred shares.

[96] *See supra* note 5.

constituencies under the Voting Agreement and the absence of any Key Holder Designee would mean that a unilateral act of the Company's Series A Designees cannot satisfy the terms of Section 1.2(e). For the same reason, neither side successfully elected Industry Directors at the Annual Meeting.

Similarly, Section 1.4(a)'s requirement that a removal of the directors elected under Section 1.2(e) be directed or approved by the affirmative vote of the "Person" entitled under Section 1.2 to designate that director were not satisfied for the same reason. The absence of any "Person" representing the Key Holder Designees made the removal of Dura invalid. Moreover, the Series A Designees' seats were vacant at this time, as Monaco resigned on August 21, 2013 and the Pallotta Proxy had not yet been executed which would permit Gorman to vote the majority of the Series A Preferred and allow him to elect new directors under Sections 1.2(a) or (b). In sum, the board is comprised of Salamone, Gorman, Ford, and Dura. The seats of the Key Holder Designees and one of the Industry Directors are vacant.

## V. CONCLUSION

The Court concludes that Section 1.2(b) of the Voting Agreement is not clearly and unambiguously a per capita voting mechanism and thus our law's presumption in favor of majority voting applies. It also concludes that Section 1.2(c) is a per capita voting provision based on the plain meaning of

46

"elect," when decided by three natural persons, and the conclusion that a majority of shares interpretation would render Schedule B meaningless. Because Section 1.2(b) is a majority voting provision, Gorman duly elected Ford as the Series A Designee at the Annual Meeting; the Key Holder Designees were not duly elected at the Annual Meeting because neither proposed slate appears to have complied with the Voting Agreement. Gorman also elected himself to the Pallotta Designee seat at the Annual Meeting. Gorman has not demonstrated that his actions before the Annual Meeting complied with the Voting Agreement, except that he successfully removed Halder as a Key Holder Designee on August 14, 2013.

Counsel are requested to confer and to submit an implementing form of order.